IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Carlos Rene Morales, Rosa Vargas | ) | C/A No.:_____ |
| Morales, Juan Mijangos Vargas, Juneidy | ) | |
| MijangosVargas, D.M.V., J.A.M., | ) | |
| Salvador Alfaro, Johana Gutierrez, | ) | |
| Y.S.G.R., J.I.G.R., Lesly Padilla Padilla, | ) | |
| E.D.N.P, and E.I.N.P., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **COMPLAINT**

When "police" knock on your door, show you a picture of a "criminal," and tell you they are looking for him or her, it is reasonable to fling your door wide open. But when it turns out the agents are not police, and they are not looking for a criminal (because there is no criminal), and they are, in fact, immigration agents looking for one of your family members, it cannot reasonably be argued that you provided knowing consent for a complete search of your home. This case arises from a series of immigration raids in and around Atlanta targeting families during New Year's in 2016. Immigration agents used "ruses" to gain access to three families' homes. Such conduct is egregious; its victims are innocent parents and their children; and its damages are lasting and substantial.

## PARTIES

1. Plaintiff Rosa Vargas Morales is a national and citizen of Guatemala. She permanently resides in Stone Mountain, Georgia, in DeKalb County. She is the mother of co-Plaintiffs Juan Mijangos Vargas, Juneidy Mijangos Vargas, and D.M.V; the sister to co-Plaintiff Carlos Rene Morales; and the grandmother to co-Plaintiff J.A.M.

2. Plaintiff Carlos Rene Morales is a national and citizen of Guatemala. He permanently resides in Stone Mountain, Georgia, in DeKalb County. He is the uncle to co-Plaintiffs Juan Mijangos Vargas, Juneidy Mijangos Vargas, and D.M.V.; the brother to co-Plaintiff Rosa Vargas Morales; and the great-uncle to co-Plaintiff J.A.M.

3. Plaintiff Juan Mijangos Vargas is a national and citizen of Guatemala. He permanently resides in Stone Mountain, Georgia, in DeKalb County. He is the brother of co-Plaintiffs Juneidy Mijangos Vargas and D.M.V.; the nephew to co-Plaintiff Carlos Rene Morales; the uncle to co-Plaintiff J.A.M.; and the son of co-Plaintiff Rosa Vargas Morales. He was 17-years old at the time of the raid.

4. Plaintiff Juneidy Mijangos Vargas is a national and citizen of Guatemala. She permanently resides in Stone Mountain, Georgia, in DeKalb County. She is the sister of co-Plaintiffs Juan Mijangos Vargas and D.M.V.; the niece to co-Plaintiff Carlos Rene Morales; the mother of co-Plaintiff J.A.M.; and the daughter of co-Plaintiff Rosa Vargas Morales.

5. Plaintiff D.M.V. is a national and citizen of Guatemala. She permanently resides in Stone Mountain, Georgia, in DeKalb County. She is the sister of co-Plaintiffs Juan Mijangos Vargas and Juneidy Mijangos Vargas; the niece to co-Plaintiff Carlos Rene Morales; the aunt of co-Plaintiff J.A.M.; and the daughter of co-Plaintiff Rosa Vargas Morales. Plaintiff D.M.V. is a minor; she is 13-years old. She was ten years old at the time of the raid.

6.  Plaintiff J.A.M. is a national and citizen of the United States. He permanently resides in Stone Mountain, Georgia, in DeKalb County. He is the nephew of co-Plaintiffs Juan Mijangos Vargas and D.M.V.; he is the great nephew to co-Plaintiff Carlos Rene Morales; he is the daughter of co-Plaintiff Juneidy Mijangos Vargas; and the grandson of co-Plaintiff Rosa Vargas Morales. Plaintiff J.A.M. is a minor; he is three years old. He was one year and five months old at the time of the raid.

7.  Plaintiff Salvador Alfaro is a national and citizen of El Salvador. He permanently resides in Norcross, Georgia, in Gwinnett County. He is the husband to co-Plaintiff Johana Gutierrez.

8.  Plaintiff Johana Gutierrez is a national and citizen of Honduras. She permanently resides in Norcross, Georgia, in Gwinnett County. She is the wife of co-Plaintiff Salvador Alfaro and the mother of co-Plaintiffs Y.S.G.R. and J.I.G.R.

9.  Plaintiff Y.S.G.R. is a United States citizen. Y.S.G.R. permanently resides in Norcross, Georgia, in Gwinnett County. Y.S.G.R. is the child of co-Plaintiff Johana Gutierrez. Y.S.G.R. is a minor; she is 14 years old. She was 12 years old at the time of the raid.

10. Plaintiff J.I.G.R. is a United States citizen. He permanently resides in Norcross, Georgia, in Gwinnett County. J.I.G.R. is the child of co-Plaintiff Johana Gutierrez. J.I.G.R. is a minor; he is ten years old. He was nine years old at the time of the raid.

11. Plaintiff Lesly Padilla Padilla is a national and citizen of Honduras. She permanently resides in Atlanta, Georgia, in DeKalb County. She is the mother of co-Plaintiffs E.D.N.P. and E.I.N.P.

12. Plaintiff E.D.N.P is a national and citizen of Honduras. He permanently resides in Atlanta, Georgia, in DeKalb County. He is the son of co-Plaintiff Lesly Padilla Padilla and the twin

brother of co-Plaintiff E.I.N.P. Plaintiff E.D.N.P. is a minor; he is 11 years old. He was nine years old at the time of raid.

13. Plaintiff E.I.N.P. is a national and citizen of Honduras. He permanently resides in Atlanta, Georgia, in DeKalb County. He is the son of co-Plaintiff Lesly Padilla Padilla, and the twin brother of co-Plaintiff E.D.N.P. E.I.N.P. is a minor; he is 11 years old. He was nine years old at the time of the raid.

14. Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., for the tort claims in this Complaint.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over all claims in this case under 28 U.S.C. § 1331, 28 U.S.C. § 1346(b)(1), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq.

16. This Court has authority to enter declaratory relief under 28 U.S.C. § 2201.

17. This complaint is timely under 28 U.S.C. § 2401(b) because the tortious acts occurred on or before January 2, 2016; the Plaintiffs filed the administrative complaints with the DHS and ICE on October 27, 2016; the agencies denied those claims on June 12, 2017; and this suit was filed on December 11, 2017.

18. Venue is proper in the Northern District of Georgia under 28 U.S.C. §§ 1391, 1402(b) because a substantial part of the events giving rise to the claims occurred in this district and the Plaintiffs reside in this district.

19. All administrative remedies have been exhausted under 28 U.S.C. § 2675.

## FACTS

### *Operation Border Resolve*

20. In December 2015, the United States Department of Homeland Security ("DHS") approved an Enforcement and Removal Operation ("ERO") entitled "Operation Border Resolve." The objective of Operation Border Resolve was to target "Family Units" for deportation.

21. DHS directed its sub-agency, Immigration and Customs Enforcement ("ICE"), to execute Operation Border Resolve.

22. Operation Border Resolve specifically targeted family units from El Salvador, Honduras, and Guatemala living in nine major U.S. metropolitan areas, including Atlanta, Georgia.

23. DHS set a numeric goal for apprehensions and deportations at 400 individuals.

24. DHS encouraged ICE field offices to allocate more agents to each enforcement team than it typically would. DHS allocated funds to cover the cost of the additional agents.

25. Because Operation Border Resolve targeted family units, DHS directed ICE field offices to ensure that the enforcement teams took the necessary supplies to detain children—including car seats, diapers, baby food, and baby formula.

26. DHS did not require ICE field offices to notify local law enforcement agencies about the planned raids.

27. DHS directed ICE to conduct the raids on January 2 and 3, 2016, between the hours of 6:00 AM and 10:00 PM.

28. DHS directed that all personnel assigned to Operation Border Resolve be trained on the Fourth Amendment.

29. ICE specifically instructs its agents that, if they claim to be a member of local law enforcement during a ruse, the agents must notify the local law enforcement agency beforehand.

30. On January 2 and 3, 2016, ICE agents conducted this multistate enforcement operation, sweeping into homes across Georgia, North Carolina, and Texas.

31. ICE agents arrested 121 people during Operation Border Resolve and transferred them to an immigration detention facility in Dilley, Texas.

32. The ICE Field Office Director for Atlanta seeks to scare foreign nationals through such raids and searches. He is quoted as saying: "If you're in this country illegally, you should be scared. . . . We're probably going to come knocking at some point." Lee, Vivian, "Please, God, Don't Let Me Get Stopped": Around Atlanta, No Sanctuary for Immigrants, N.Y. Times at A1 (Nov. 26, 2017).

### The Vargas Family

33. Plaintiff Rosa Vargas Morales ("Ms. Vargas") lives in the Stone Mountain home with her son Plaintiff Juan Mijangos Vargas; her daughters, Plaintiff Juneidy Mijangos Vargas and D.M.V.; her grandchild J.A.M.; and her brother, Plaintiff Carlos Rene Moran Morales.

34. At approximately 4:00 AM on Saturday, January 2, 2016, the family was awakened by the doorbell ringing, banging on the front door, and flashlights shining through the windows of the home.

35. Plaintiff Carlos Rene Morales ("Mr. Morales") looked out the window and saw approximately nine unmarked and unfamiliar cars outside his home and approximately five officers standing outside. He observed "POLICE" labels on the back of the officers' jackets, and "ICE" on the back of one agent's jacket.

36. This knocking, doorbell ringing, and shining of flashlights into the house persisted while the family cowered in the hallway, unsure of what to do.

37.  At one point, Mr. Morales opened a bathroom window to speak to the officers.

38. They asked Mr. Morales to open the door so they could speak to him, but when he asked for an explanation, they refused to provide any information about why they wanted to speak with him.

39. The officers eventually left.

40. The family was terrified to leave their home that day, but they needed certain food items. Later that morning, Mr. Morales left the house to go to the grocery store.

41. When he returned home, two cars stopped him near the driveway of the house.

42. Two men, wearing jackets labeled "ICE" exited the cars, approached Mr. Morales' car, and asked to see his driver's license.

43. In Spanish, Mr. Morales asked the agents why they had pulled him over. They provided no traffic-related reason for stopping him.

44. Rather, the agents stated in Spanish that they knew a criminal suspect named "Miguel Soto" was in Mr. Morales' home. They told Mr. Morales that they could arrest him for obstructing a criminal investigation.

45. Mr. Morales explained that there was no Miguel Soto in the home; the agents then stated that they saw Mr. Soto enter the house that morning. Mr. Morales provided the agents with the names of the people who were present in the house to explain that no one named Miguel Soto lived or was currently staying there.

46. The agents continued to insist to Mr. Morales that they needed to enter the house. They repeatedly threatened that he would be arrested for obstructing a criminal investigation if he did not let them in the house. Mr. Morales feared the agents would arrest him unless he proved to them that no one named "Miguel Soto" was in the house.

47. Mr. Morales again—and repeatedly—tried to explain that no one named "Miguel Soto" lived in his home.

48. Mr. Morales observed guns on both agents.

49. Both agents yelled at and threatened Mr. Morales throughout the interaction.

50. Mr. Morales told the agents that he would obtain the identification cards of the people currently present in the home to show that no one named "Miguel Soto" was present there. The agents followed him to his front door.

51. The agents told Mr. Morales that they wanted to enter the home. He asked them if they had a warrant. The agents told him that a judge had signed a warrant and they needed to come in. They never produced or otherwise proved to Mr. Morales that they had a warrant to enter his home.

52. At the entry to the home—and prior to touching the door knob—Mr. Morales explained to the agents that he would enter the home to obtain the identification cards of the people inside. He specified that the agents should wait outside, and they verbally agreed.

53. The agents did not seek his consent to enter the home.

54. He did not provide them with consent to enter his home.

55. Regardless, as Mr. Morales turned the door knob to enter his home, he observed one agent put his hand on the door above his head to push the door, and he heard the other agent simultaneously kick on the door.

56. The door opened, and the agents entered the home.

57. Mr. Morales never gave the agents verbal permission to enter the home, and he never indicated otherwise that he consented to their entry. Nor did any other occupant of the house provide verbal or other consent to the agents' entry.

58. The two ICE agents ordered the family members to gather in the living room and provide identification.

59. Mr. Morales provided identification for his entire family. After the agents looked at the IDs, Mr. Morales asked the agents why they were still there. They falsely stated that they were waiting on another agent with a scanner to check that the IDs were real. This was a lie, as no agent ever scanned their IDs.

60. Mr. Morales, Ms. Vargas, her two adult children, and her infant grandchild then waited in the room for approximately 40 minutes, until a female agent arrived. D.M.V. remained asleep in her room. During this time, the Vargas Family felt that they were not free to leave the room, where the armed agents were detaining them.

61. At one point, Mr. Morales stood up to relieve discomfort in his back, and an agent pushed him down, telling Mr. Morales to stay seated or he would be arrested.

62. Upon arriving, the female agent read aloud the names of Rosa Vargas Morales, and her children, Juan Mijangos Vargas, Juneidy Mijangos Vargas and D.M.V. She explained that the agents were there to arrest them, because Ms. Vargas had missed an immigration court date. The agent said that Ms. Vargas and all three of her children would need to pack bags and come with them. Mr. Morales stated that Ms. Vargas had not missed a single court date, but the agent responded that she did not want to hear the family's explanations.

63. The agents gave Ms. Vargas and her children bags and instructed them to pack personal belongings for the trip.

64. The agents then asked about D.M.V. Ms. Vargas explained she was downstairs sleeping.

65. Ms. Vargas escorted the female agent to D.M.V.'s bedroom. The agent took the blanket and sheets off D.M.V. and physically shook her awake.

66. D.M.V. woke up terrified and trembling. The agent told D.M.V. they had to leave, grabbed her by the shoulders, and pulled her up. D.M.V. was ten years old at the time.

67. The agents decided not to bring Ms. Vargas's older daughter, Juneidy Mijangos Vargas, with them, because she is the mother of J.A.M. who was an infant at the time. The agents escorted Ms. Vargas, Juan Mijangos Vargas and D.M.V. to a vehicle and drove them to an immigration detention center in Atlanta.

68. During the transport to the Atlanta detention center and while detained there, Ms. Vargas complained of a migraine and asked for water. She was never given water. She asked the detention staff in Atlanta for access to prescription Ibuprofen that she had brought with her other belongings. They refused to give it to her.

69. At the Atlanta detention center, agents pressured Ms. Vargas to sign papers. They refused to explain the nature or content of the documents. She repeatedly refused and requested a phone call to speak with her immigration attorney. They denied her the opportunity to speak with her attorney. Eventually, she succumbed to their pressure and signed the documents.

70. In the evening of that same day, Ms. Vargas and her children were transported by plane to Texas. On the flight, Ms. Vargas again requested her medication and was denied. Ms. Vargas fainted on the plane.

71. A few days after arriving in Texas, the Board of Immigration Appeals granted Ms. Vargas and her two minor children a stay of deportation. However, ICE continued to detain them for several weeks, at detention centers in Texas and Pennsylvania. The Board of Immigration Appeals subsequently vacated the removal orders against them.

72. Ms. Vargas and her children were detained altogether for over a month in ICE detention facilities located in Georgia, Texas, and Pennsylvania.

73. Ms. Vargas and her children returned to their home in Stone Mountain.

74. Plaintiff Rosa Vargas Morales experienced and continues to experience serious emotional pain and suffering as a result of the agents' actions during the raid. Since the raid, she suffers from debilitating mood swings. She often isolates herself. She saw both a counselor and psychiatrist for treatment at a mental health service provider in Atlanta. The provider discontinued treatment after January 2017.

75. Ms. Vargas also saw and continues to see an out-of-state psychologist via video calls.

76. While detained in Texas, Ms. Vargas was treated for depression. Her headaches got so bad on two occasions during her detention that she was transported to a local hospital for treatment.

77. After the raid, Plaintiff D.M.V. woke up every morning in tears. She struggled with nightmares for months. She didn't want to go to school. D.M.V. refused to walk to the school bus without an escort, even though the bus stop was just outside of her house. Her performance in school suffered significantly.

78. After the raid, Plaintiff Juan Mijangos Vargas refused to take the bus to school. He became more irritable and aggressive at school, and his academic performance suffered. Because his teachers noticed a marked change in his behavior and performance, the school counselor requested to meet with him and met with him several times. She recommended additional counseling.

79. After the raid, Plaintiff Juneidy Mijangos Vargas stayed in the house and refused to leave. She had never before been separated from her mother. During that time, she often refused to leave her bedroom and interact with the other family members. She ate very little for a month following the raid. She refused to eat dinner with the family at the dinner table. Though she

had been an excellent student, she dropped out of high school after the raid. Because ICE did not take Ms. Mijangos Vargas on account of J.A.M., she believed that ICE would take her at a later time, when she was not with her child. Counselors, teachers, and family tried to convince her to go back to school, but she continued to refuse. Her mental anguish has gone untreated.

80. After the raid, Ms. Mijangos Vargas would not leave J.A.M. alone. Before, she was able to leave him with other people. She feels very protective of him. Now, when J.A.M. is around a new person, he is frightened and nervous.

81. After the raid, Mr. Morales suffered mental anguish. He struggles to overcome feelings of anger and helplessness. His mental anguish has gone untreated.

82. ICE agents did not have a warrant that permitted them to enter or search the Vargas Family home or detain Plaintiffs Rosa Vargas Morales, Carlos Rene Morales, Juan Mijangos Vargas, Juneidy Mijangos Vargas, D.M.V., and J.A.M.

83. No exigent circumstances existed that would allow ICE agents to enter or search the Vargas Family home or detain Plaintiffs Rosa Vargas Morales, Carlos Rene Morales, Juan Mijangos Vargas, Juneidy Mijangos Vargas, D.M.V., and J.A.M.

84. Mr. Morales did not give consent for ICE agents to enter or search the Vargas Family home or detain Plaintiffs Rosa Vargas Morales, Carlos Rene Morales, Juan Mijangos Vargas, Juneidy Mijangos Vargas, D.M.V., and J.A.M. Nor did any other occupant or resident give consent to the agents' entry and search of the Vargas Family home.

### *The Gutierrez Family*

85. The Gutierrez Family comprises Plaintiffs Salvador Alfaro, Johana Gutierrez, and her children, Y.S.G.R., and J.I.G.R.

86. At approximately 5:00 AM, on Saturday, January 2, 2016, residents of the Gutierrez Family home awoke to the sound of loud banging on the front door and ringing of the doorbell.

87. At that time, Plaintiffs Gutierrez, Alfaro, Y.S.G.R. (age 12), and J.I.G.R. (age 9) along with Ms. Gutierrez's niece, Ana Lizeth Mejia Gutierrez, and her son, W.G.M. (age 10) were present and asleep in the home.

88. Ms. Gutierrez and Mr. Alfaro got out of bed and went downstairs to the front door. Through the front window, they could see officers with flashlights and unfamiliar, unmarked cars in front of the house.

89. In English, Ms. Gutierrez asked, "Who is it?"

90. The officers held up a photo through the window, and shined their flashlights on it. It was a picture of an African American man. They indicated that the man was a criminal suspect and they had been told that the person in the photo was in the Gutierrez Family home.

91. Ms. Gutierrez had repeatedly been a victim of assault. She was frightened by the possibility that a strange man might be in her home.

92. Mr. Alfaro opened the door and approximately five or six officers pushed past them and immediately entered the house.

93. The officers who entered the house had guns on their hips.

94. The officers searched the entire house—some going into the living room, others going upstairs. They checked all rooms, including the laundry room, kitchen, and garage, and they looked underneath beds and in closets.

95. The officers woke everyone in the house and brought them—in their pajamas—into the living room where they detained them for 30 minutes to an hour. Everyone was scared and confused. The children were crying.

96. The officers asked for Ms. Ana Mejia Gutierrez, and her son, W.G.M.

97. When Ms. Gutierrez realized that the officers were not police, but rather ICE agents, she tried to get her phone to make a call, but an agent told her not to move.

98. One agent stood between the family in the living room and the front door throughout the raid. None of the Plaintiffs felt free to leave. At one point, the agents asked for identification cards. Ms. Gutierrez offered to go upstairs to get the IDs, and the agent in the living room told her not to move, placing his hand on his holstered gun.

99. The agents instructed Ms. Ana Mejia Gutierrez to get a change of clothes for herself and her son, W.G.M. She went upstairs with an agent to gather some clothes. The agents looked through all of their things, and then brought her downstairs where they patted her down.

100.     Ms. Gutierrez asked the agents why they had lied to enter the house. They told her to be quiet. She asked about her rights. The agent standing at the door told her that she would get her rights once they left with her niece, Ms. Ana Mejia Gutierrez.

101.     The agent guarding the door threatened to arrest Ms. Gutierrez several times.

102.     Ms. Gutierrez told the agents that they were violating her rights. She told them they were traumatizing the children, that they should have a warrant, and that they had lied. The interpreter heard her, but stopped interpreting what she said.

103.     Ms. Gutierrez's young nephew, W.G.M., was sitting alone, away from the others in the living room. Ms. Gutierrez saw that he was trembling. She motioned for W.G.M. to come over to her, so that she could comfort him. The agent stationed in the living room commanded W.G.M. not to move.

104.     The agents arrested Ms. Ana Mejia Gutierrez and W.G.M. On their way out, Ms. Gutierrez tried to hug W.G.M. but an agent put his hand between them, blocking her.

105.    The agents took Ms. Ana Mejia Gutierrez and W.G.M. to several detention facilities in different states. The Board of Immigration Appeals subsequently vacated the final removal orders against Ms. Ana Mejia Gutierrez and W.G.M.

106.    After the raid, Y.S.G.R. missed school for a week. Y.S.G.R. refused to sleep alone. Y.S.G.R. indicated to a classmate that she was thinking about harming herself. She was reported to a school counselor who referred her to a psychologist. She met with the psychologist and later her pastor to work through the mental anguish and pain as a result of the raid.

107.    As a result of the raid, J.S.G.R. has suffered significant emotional pain and distress. J.S.G.R. has met with the family's pastor.

108.    As a result of the raid, Ms. Gutierrez has suffered emotional pain and distress. She has trouble remembering things and she struggles with constant anxiety and nervousness.

109.    As a result of the raid, Mr. Alfaro suffered emotional pain and suffering. He has experienced increased stress and anguish. He felt helpless because he could not help Ms. Gutierrez with her fears and anxiety. For a year after the raid, their marital relationship suffered.

110.    ICE agents did not have a warrant that permitted them to enter or search the Gutierrez family home or detain Ms. Gutierrez, Mr. Alfaro, Y.S.G.R., or J.S.G.R.

111.    No exigent circumstances existed that would allow ICE agents to enter or search the Gutierrez family home or detain Ms. Gutierrez, Mr. Alfaro, Y.S.G.R., or J.S.G.R.

112.    Neither Ms. Gutierrez nor Mr. Alfaro gave and could have given knowing or voluntary consent for ICE agents to enter or search the Gutierrez family home or detain Ms. Gutierrez,

Mr. Alfaro, Y.S.G.R., or J.S.G.R. because the ICE agents gained entry by lying about their

purpose for entry and remained after Ms. Gutierrez asserted her rights.

### The Padilla Family

113.    The Padilla Family comprises Plaintiffs Lesly Padilla Padilla and her minor sons,

E.D.N.P. and E.I.N.P, who are twin brothers.

114.    From mid-2014 to January 2016, approximately a year and a half, the family lived in a

first-floor, two-bedroom apartment in Norcross, Georgia.

115.    At approximately 8:00 AM on Saturday, January 2, 2016, officers knocked loudly on Ms.

Padilla's door.

116.    Ms. Padilla left her bedroom, where her boys were sleeping, and went to the front door.

Through the closed door, in Spanish, she asked, "How can I help you?" The officers initially

responded in English, then switched to Spanish, stating that they believed a criminal suspect

was present in her apartment.

117.    Ms. Padilla looked through the peephole. She could see approximately five officers

outside of her apartment.  She saw "POLICE" on the back of one officer's jacket. The ICE

agents did not inform her that they were immigration agents; nor did they present any

identification or identify themselves as "ICE" on their clothing.

118.    An officer showed her a photo of an African American man, and stated in Spanish that

the man in the photo was a criminal suspect named "David." The officer told her that they

had been told that the suspect lived at her address.

119.     Ms. Padilla told the officers that the man did not live at her apartment and he was not in

her apartment.

120.    The officers again requested to enter and search the home to ensure the criminal suspect was not in the apartment.

121.    Ms. Padilla believed that the officers were conducting a criminal investigation and looking for a criminal suspect named "David." Based on this belief, she opened the door and the officers entered her apartment.

122.    Had Ms. Padilla been informed or otherwise learned that the agents were immigration officers, she would have refused their entry.

123.    Approximately five officers entered the home, and they immediately ordered everyone to gather in the living room.

124.    The officers searched the entire apartment, including closets and cabinets.

125.    The officers asked everyone in the apartment for their names and identification.

126.    Ms. Padilla and her children (age 9) did not believe that they were free to leave the living room, where they were detained by the officers. Ms. Padilla asked the officers if she could check her phone, because she was expecting a call from her boss. An officer took her phone and refused to give it to her.

127.    After completing the search, an agent asked Ms. Padilla in Spanish for her full name and the length of time she had been residing in the Norcross apartment. Immediately after Ms. Padilla provided the information, the officer exited the apartment and quickly returned with documents and two additional officers. The officers then revealed that they were ICE agents, not police officers, and that they were there to arrest Ms. Padilla and her children for deportation.

128.    She told them she was not aware of any deportation order in her case, and that she had an immigration attorney and an ankle monitor. She asked to call her attorney and the ICE agents refused.

129.    The agents then told her that she and her children had to come with them. They instructed her to bring extra clothing, but she insisted that they wouldn't need it. Two agents followed Ms. Padilla into her bedroom, with her sons. One of her boys asked, "Why are they taking us? What did we do wrong?" She helped them with their jackets, and then the agents loaded her and her two crying children into an unmarked car. The children cried throughout the encounter.

130.    ICE detained and transported Ms. Padilla, E.D.N.P., and E.I.N.P. to a detention center in Atlanta and that evening, they were transported by plane to a detention center in Dilley, Texas.

131.    The Padilla Family was detained altogether for approximately one month and four days in ICE facilities located in Georgia, Texas, and Pennsylvania.

132.    After their release, Ms. Padilla and her two sons returned to the Atlanta area.

133.    As a result of the immigration raid, Ms. Padilla, and her sons E.D.N.P. and E.I.N.P., have suffered serious emotional distress. This includes E.D.N.P. and E.I.N.P. having nightmares for months after the raid. They also get very anxious if someone knocks at the door. When someone knocks at the front door, they demand that Ms. Padilla check whether it is immigration agents before opening the door.

134.    Prior to the raid, E.D.N.P. and E.I.N.P. both attended school regularly, and they were doing well academically. Since the raid, they have been performing poorly in school.

135.   Ms. Padilla sought mental health treatment for post-raid stress and guilt experienced by herself and her sons, but she could not afford anything beyond an initial consult.

136.   Thus, their conditions have gone untreated.

137.   Ms. Padilla suffers physical illness when she thinks about raid.

138.   The trauma from the 2016 raid has compounded prior trauma experienced by the Padilla Family in their home country, Honduras. They fled Honduras because the father of E.D.N.P. and E.I.N.P. was extremely abusive to Ms. Padilla, and the authorities in Honduras failed to stop the abuse.

139.   During her detention, Ms. Padilla lost her apartment and the family possessions located in the apartment.

140.   ICE agents did not have a warrant that permitted them to enter or search the Padilla family home or detain Ms. Padilla, E.D.N.P., or E.I.N.P.

141.   No exigent circumstances existed that would allow ICE agents to enter or search the Padilla family home or detain Ms. Padilla, E.D.N.P., or E.I.N.P.

142.   Ms. Padilla did not give and could not have given knowing or voluntary consent for ICE agents to enter or search the Padilla family home or detain Ms. Padilla, E.D.N.P., or E.I.N.P. because the ICE agents gained entry by lying about their purpose for entry.

143.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents were acting within the scope of their employment.

144.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents had no judicially issued warrant.

145.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents were not engaged in discretionary decision making.

146.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents did not exercise due care.

147.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents were acting in an investigative or law enforcement role.

148.   During all raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, ICE agents violated the Fourth Amendment rights of each plaintiff.

149.   As a consequence of the raids of the Vargas Family, the Gutierrez Family, and the Padilla Family, each Plaintiff has suffered harm, including but not limited to emotional distress, pain and suffering, property loss, loss of consortium, either spousal or filial, and trauma.

### FIRST CAUSE OF ACTION
### (False Imprisonment)

150.   Plaintiffs re-allege all facts averred herein as though restated.

151.   ICE, through its investigative and law enforcement agents, intentionally and unlawfully deprived each Plaintiff of his or her personal liberty by entering their homes without a judicial warrant or voluntary consent and absent exigent circumstances and by detaining Plaintiffs against their will in violation of O.C.G.A. § 51-7-20; Ferrel v. Mikula, 672 S.E.2d 7, 10 (Ga. App. 2008); Lyttle v. United States, 867 F. Supp. 2d 1256, 1297 (M.D. Ga. 2012).

152.   The ICE agents committed these acts as employees of the U.S. while acting within the scope of their employment at all relevant times.

153.   The ICE agents were acting in an investigative or law enforcement role at all relevant times.

154.   All of the Plaintiffs were detained; they were unable to leave their homes while ICE agents conducted an unlawful, pre-textual search.

155.   Plaintiffs' detention was unlawful because:

a.  ICE had no probable cause to detain any Plaintiff;

b.  ICE had no search warrant;

c.  ICE used an unconstitutional "ruse" to gain entrance or consent to enter each Plaintiff's home;

d.  ICE entered each Plaintiff's home without knowing and voluntary consent;

e.  No exigent circumstances existed that would allow ICE to enter any Plaintiffs' home; and

f.  ICE's detention of each Plaintiff was otherwise unlawful.

156.  The due care exception under 28 U.S.C. § 2680(a) does not apply to this cause of action. Lyttle v. United States, 867 F. Supp. 2d. 1256, 1257 (M.D. Ga. 2012).

157.  The discretionary function exception under 28 U.S.C. § 2680(a) does not apply to false imprisonment. Nguyen v. United States, 556 F.3d 1244, 1260 (11th Cir. 2009).

158.  This false imprisonment caused Plaintiffs damages.

159.  Those damages include but are not limited to:

a.  Property damage and loss;

b.  Emotional distress;

c.  Lost wages;

d.  Mental anguish;

e.  Loss of consortium, filial and spousal; and

f.  Other damages to be proven at trial.

160.  Plaintiffs are entitled to damages against the United States for false imprisonment to the full extent allowed under Georgia law and the FTCA, in an amount to be determined by the trier of fact.

161.   Under the Federal Tort Claims Act, defendant United States of America is liable for these

actions.

## SECOND CAUSE OF ACTION
### (Trespass)

162.   Plaintiffs re-allege all facts herein as though restated.

163.   The ICE agents were acting within the scope of their employment at all relevant times.

164.   The ICE agents were acting in an investigative or law enforcement role at all relevant

times.

165.   The ICE agents intentionally and unlawfully interfered with Plaintiffs' enjoyment of

private property in which Plaintiffs had a possessory interest under O.G.C.A. § 51-9-1.

166.   The ICE agents unconstitutionally entered all of Plaintiffs' homes without a judicially

issued warrant or voluntary consent and absent exigent circumstances.

167.   Further, the ICE agents unconstitutionally entered Plaintiffs' homes by using an

unconstitutional "ruse" to gain entry.

168.   All such actions violated Plaintiffs' Fourth Amendment rights to be free from

unreasonable searches and seizures.

169.   Defendant's actions were not discretionary because Defendant has no discretion to act

unconstitutionally. Rosas v. Brock, 826 F.2d 1004, 1008 (11th Cir.1987); Mancha v.

Immigration & Customs Enf't, No. 106-CV-2650-TWT, 2009 WL 900800, at *4 (N.D. Ga.

Mar. 31, 2009).

170.   This unconstitutional trespass caused Plaintiffs damages.

171.   Those damages include but are not limited to:

   a.   Property damage and loss;

   b.   Emotional distress;

    c.  Lost wages;

    d.  Mental anguish;

    e.  Loss of consortium, filial and spousal; and

    f.  Other damages to be proven at trial.

172.    Plaintiffs are entitled to damages against the United States for trespass to the full extent allowed under Georgia law and the FTCA, in an amount to be determined by the trier of fact.

173.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## THIRD CAUSE OF ACTION
### (Negligence)

174.    Plaintiffs re-allege all facts herein as though restated.

175.    The ICE agents were acting within the scope of its employment at all relevant times.

176.    The ICE agents were acting in an investigative or law enforcement role at all relevant times.

177.    ICE had a duty to act with reasonable care and to abide by the U.S. Constitution during enforcement actions including but not limited to entering and searching a home only when there is a judicially issued warrant, exigent circumstances, or knowing and voluntary consent to do so.

178.    ICE also had a duty to act with reasonable care and to follow its own practices and procedures, including but not limited to notifying local law enforcement authorities that it intended on claiming to be "police" during the course of its raids.

179.    ICE breached these duties by unlawfully entering and searching Plaintiffs' homes without a judicially issued warrant, exigent circumstances, or knowing consent.

180.   ICE also breached internal, non-discretionary DHS practices and policies, including but not limited to policies related to the use of "ruses."

181.   As a direct and proximate result of Defendant's breaches of duties, Plaintiffs have suffered and continue to suffer damages including, but not limited to:

    a.   Property damage and loss;

    b.   Emotional distress;

    c.   Lost wages;

    d.   Mental anguish;

    e.   Loss of consortium, filial and spousal; and

    f.   Other damages to be proven at trial.

182.   Plaintiffs are entitled to damages against the United States for trespass to the full extent allowed under Georgia law and the FTCA, in an amount to be determined by the trier of fact.

183.   Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

**FOURTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

184.   Plaintiffs re-allege all facts herein as though restated.

185.   The ICE agents were acting within the scope of its employment at all relevant times.

186.   The ICE agents were acting in an investigative or law enforcement role at all relevant times.

187.   The ICE agents acted intentionally or recklessly when they unlawfully entered and searched Plaintiffs' homes. They also acted intentionally and recklessly when they unlawfully detained each Plaintiff.

188.   The ICE agents' actions were extreme and outrageous.

189.   ICE used racial stereotypes to scare the Gutierrez and Padilla Families into "consenting" to their search.

190.   The ICE agents forcefully entered the Vargas' home without requesting or obtaining consent.

191.   The ICE agents also entered the Vargas's home by repeatedly threatening arrest for a falsified charge of "obstruction of justice."

192.   The ICE agents gained entry into all of the Plaintiffs' homes by deliberately lying about the presence of fictitious criminal suspects in their homes and preying on their fear of safety to unlawfully gain entry into their homes.

193.   All such conduct is extreme and outrageous.

194.   The ICE agents' outrageous and extreme conduct directly caused Plaintiffs emotional distress and other damages.

195.   Those damages include but are not limited to:

a.   Property damage and loss;

b.   Emotional distress;

c.   Lost wages;

d.   Mental anguish;

e.   Loss of consortium, filial and spousal; and

f.   Other damages to be proven at trial.

196.   The emotional distress is severe, lasting, and grave.

197.   Plaintiffs are entitled to damages against the United States for intentional infliction of emotional distress to the full extent allowed under Georgia law and the FTCA, in an amount to be determined by the trier of fact.

198.    Under the Federal Tort Claims Act, defendant United States of America is liable for these

actions.

## FIFTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

199.    Plaintiffs re-allege all facts herein as though restated.

200.    The ICE agents were acting within the scope of its employment at all relevant times.

201.    The ICE agents were acting in an investigative or law enforcement role at all relevant

times.

202.    Alternatively, the ICE agents acted negligently when they unlawfully entered and

searched Plaintiffs' homes.

203.    ICE's negligence was extreme and outrageous.

204.    The ICE agents used racial stereotypes to scare the Gutierrez and Padilla Families into

"consenting" to their search.

205.    The ICE agents forcefully entered the Vargas' home without requesting or obtaining

consent.

206.    The ICE agents also entered the Vargas' home by repeatedly threatening arrest for a

falsified charge of "obstruction of justice."

207.    ICE gained entry into all of the Plaintiffs' homes by lying.

208.    All such conduct is extreme and outrageous.

209.    ICE's outrageous and extreme conduct caused Plaintiffs' damages.

210.    Those damages include but are not limited to:

    a.   Property damage and loss;

    b.   Emotional distress;

    c.   Lost wages;

      d.  Mental anguish;

      e.  Loss of consortium, filial and spousal; and

      f.  Other damages to be proven at trial.

211.    The emotional distress is severe, lasting, and grave.

212.    Plaintiffs are entitled to damages against the United States for negligent infliction of emotional distress to the full extent allowed under Georgia law and the FTCA, in an amount to be determined by the trier of fact.

213.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

1. Compensatory damages;

2. Punitive damages;

3. Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2678, the Equal Access to Justice Act, the Court's inherent powers, and any other applicable law;

4. Declaratory relief; and

5. Any other such relief the Court deems just and proper.

December 11, 2017               Respectfully submitted,

Daniel Werner
Georgia Bar No. 422070
SOUTHERN POVERTY LAW CENTER
1989 College Ave. NE
Atlanta, GA 30317
(404) 521-6700 (Tel)
(404) 221-5857 (Fax)
daniel.werner@splcenter.org



Lisa S. Graybill*
Texas Bar No. 24054454
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue, Suite 505
New Orleans, LA 70130
(504) 486-8982 (Tel)
(504) 486-8947 (Fax)
LisaSGraybill@splcenter.org

*Pro hac vice application forthcoming

BRADLEY B. BANIAS*
South Carolina Bar No. 76653
Barnwell, Whaley, Patterson & Helms, LLC
288 Meeting Street, Suite 200
Charleston, South Carolina 29401
P: 843.577.7700
F: 843.577.7708
bbanias@barnwell-whaley.com

*Pro hac vice application forthcoming

Attorneys for Plaintiffs